**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Montana Strong, et al., | No. CV-23-00682-PHX-KML |
| Plaintiffs, | **ORDER** |
| v. | |
| LifeStance Health Group Incorporated, | |
| Defendant. | |

Plaintiffs Montana Strong and Debra Yick filed this suit against LifeStance Health Group, Inc. ("LifeStance") alleging federal and state claims based on tracking technology LifeStance allegedly used on its website. Jointly with LifeStance, plaintiffs now seek preliminary approval of a proposed class action settlement. (Doc. 79.) Because the proposed settlement contains concerning attorneys' fees provisions, the present record does not allow for preliminary approval and the motion is denied without prejudice to renewal.

## I.    Factual Background

Defendant LifeStance is a mental healthcare company that offers "outpatient care services via in-person locations and telemedicine." (Doc. 32 at 5.) LifeStance has 600 locations and "employs more than 5,200 psychiatrists, advance practice nurses, psychologists and therapists." (Doc. 32 at 5.) Those professionals provide treatment for conditions including depression, PTSD, and bipolar disorder. (Doc. 32 at 23.) LifeStance markets and provides its services through a website, www.LifeStance.com. (Doc. 32 at 5.) Opting "to put its profits over the privacy of its Users, . . . LifeStance installed certain

tracking technologies on its website in order to intercept and to send personally identifiable information ('PII') and protected health information ('PHI'[)] . . . to third parties such as Meta Platforms, Inc. d/b/a Facebook . . . without the informed consent of its users." (Doc. 32 at 6.) The tracking technology central to this case is known as the "Meta Pixel," or simply "the Pixel."

## II.    Proposed Settlement Agreement

Following this court's January 2025 order denying in part LifeStance's motion to dismiss, the parties discussed settlement and agreed to mediation after an exchange of informal discovery. (Doc. 79 at 12.) In April, the parties participated in a private, full-day mediation before the Hon. Suzanne H. Segal of Signature Resolution and subsequent remote sessions. (Doc. 79 at 12.) The parties ultimately agreed plaintiffs will resolve all claims related to the Pixel in exchange for LifeStance providing prospective class members a common fund and additional benefits described below. (Doc. 79 at 13.)

Under the resulting proposed settlement agreement, the parties seek to certify for settlement purposes a class comprised of three subclasses:

> 1.   Settlement Subclass 1: All members of LifeStance's total patient population who booked at least one session through LifeStance's online booking tool, accessed through LifeStance's public website lifestance.com, between March 1, 2020 and April 30, 2023.
> 2.   Settlement Subclass 2: All other members of LifeStance's total patient population between March 1, 2020 and April 30, 2023, not including those in Settlement Subclass 1.
> 3.   Settlement Subclass 3: All persons who visited the LifeStance website between March 1, 2020 and April 30, 2023 but did not book appointments online or otherwise become patients.

(Doc. 79 at 13.) The parties have identified 171,915 members of Subclass 1 and 907,737 members of Subclass 2. (Doc. 79 at 15.) Members of Subclass 1 will, upon timely submittal of a claim form, receive a *pro rata* cash payment from a LifeStance-funded non-reversionary fund of $1,203,405.00, less any amount the court awards for attorneys' fees and costs. (Doc. 79 at 14.) Any unclaimed money will be sent to two data privacy

organizations as *cy pres* recipients. (Doc. 79 at 25.) Members of Subclasses 1 and 2 will receive offers to enroll for free in a twelve-month subscription to a privacy monitoring service, which the parties value at approximately $265 per redemption. (Doc. 79 at 14.) Finally, all subclass members will receive injunctive relief: LifeStance will agree to "disable and forego use of all third-party tracking pixels, to the extent any remain, other than tracking pixels compliant with HIPAA, for a period of five (5) years from the Effective Date of this Settlement Agreement." (Doc. 79 at 14).

LifeStance maintains email address information for most members of Subclasses 1 and 2 and the parties have agreed to send notices via email (or postcards where emails bounce back). (Doc. 79 at 16, 27-28.) Because LifeStance does not maintain contact information for each person who accessed its website, the parties agreed to fund a media campaign directing members of Subclass 3 (and, necessarily, all class members) to the settlement website. (Doc. 79 at 28.) To cover these administrative costs, LifeStance agreed to separately create a $300,000 fund which will go to settlement administrator Angeion's work delivering notice, maintaining the settlement website and toll-free hotline, evaluating claim forms, etc. (Doc. 79 at 15.)

Finally, attorneys' fees will be funded by two mechanisms. (Doc. 79 at 18.) The parties have agreed class attorneys will seek 25% or 33%[1] plus litigation costs from the $1.2 million fund for attorneys' fees attributable to plaintiffs' counsel's work securing the settlement for Subclass 1. (Doc. 79 at 18.) Separately, LifeStance will create a $750,000 fund for attorneys' fees "attributable to the work done to secure the settlement benefits for Settlement Subclass 2 and Settlement Subclass 3." (Doc. 79 at 15, 17-18.) LifeStance will not contest plaintiffs' counsel requesting the $750,000 and any money from this fund which goes unawarded will revert to LifeStance. (Doc. 80-1 at 19.)

In summary, the class settlement would provide the following. The 171,915 members of Subclass 1 would split approximately $800,000-$900,000 (*i.e.*, $1,203,405.00

---

[1] The parties' motion states class counsel will request 25% of the fund plus costs and expenses (Doc. 79 at 19) but the draft notice to the class states class counsel will request "up to one-third" of the fund plus costs and expenses (Doc. 80-1 at 64).

minus either 33% or 25% for fees and costs, depending on which represents the accurate settlement term). If every subclass member then makes a claim, each Subclass 1 member would receive between $4.69 and $5.25. The 171,915 Subclass 1 members and 907,737 Subclass 2 members are eligible to claim an offer for a free privacy monitoring service. And the members of Subclass 3 receive injunctive relief in the form of LifeStance being prohibited from, according to plaintiffs, engaging in illegal conduct.

## III.    Analysis

"[V]oluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Nonetheless, courts must find each settlement agreement to be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). Courts tasked with preliminary approval of settlements made before class certification "must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

### A.  Conditional Class Certification

#### a.  Legal Standard

Class certifications proposed for the purposes of settlement "demand undiluted, even heightened, attention" to Rule 23's class certification requirements because, unlike during litigation, the court won't be able to adjust class definitions as proceedings progress. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

#### b.  Class Certification in the Present Case

A class action will be certified for the purpose of settlement if it meets the four requirements in Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the three requirements in Rule 23(b). *See Howard v. Web.com Grp. Inc.*, No. CV-19-00513-PHX-DJH, 2020 WL 3827730, at *4 (D. Ariz. July 8, 2020).

1    The prerequisite of numerosity is satisfied when the proposed class is "so numerous
2  that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no
3  minimum threshold but "a proposed class of at least forty members presumptively satisfies
4  the numerosity requirement." *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 569
5  (C.D. Cal. 2012). The parties have identified 171,915 members in Subclass 1 and 907,737
6  members in Subclass 2. (Doc. 79 at 29.) This satisfies the numerosity requirement.

7    The prerequisite of commonality is satisfied when there are "questions of law or
8  fact common to the class." Fed. R. Civ. P. 23(a)(2). The plaintiffs must have suffered the
9  same injury and show their claims depend upon a "'common contention' whose 'truth or
10 falsity will resolve an issue that is central to the validity of each one of the claims in one
11 stroke.'" *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014) (citing *Wal-Mart*, 564 U.S.
12 338 at 350). "[E]ven a single common question will do." *Wal-Mart*, 564 U.S. 338 at 359
13 (simplified). Here there is a central common question of whether LifeStance improperly
14 tracked users' data without disclosure, and a common injury wherein each member's
15 protected health information was allegedly disclosed to third parties and their privacy
16 violated. (Doc. 79 at 30.) This satisfies the commonality requirement.

17    Rule 23(a)(3) requires claims of class representatives be typical of those of the class.
18 "The test of typicality 'is whether other members have the same or similar injury, whether
19 the action is based on conduct which is not unique to the named plaintiffs, and whether
20 other class members have been injured by the same course of conduct.'" *Hanon v.
21 Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Here, the parties
22 allege the named representatives suffered the same injury as that of the rest of the class,
23 based upon the same conduct by LifeStance—installing pixels which violated each
24 member's privacy. (Doc. 79 at 31.) This satisfies the typicality requirement.

25    Finally, Rule 23(a)(4)'s requirement that class representatives will adequately
26 protect the interests of the broader class asks whether named plaintiffs and their counsel
27 have conflicts of interest with other class members and will be able to vigorously prosecute
28 the action on behalf of the class. *Hanlon*, 150 F.3d at 1020. There is no indication of a

conflict of interest between Strong and Yick and the remainder of the class because each member, including Strong and Yick, has suffered the same privacy violation as other members of their subclass. Nor is counsel unqualified or inexperienced; plaintiffs' counsel appears capable of taking the matter to trial and their competence and experience (including in pixel-related complex litigation) has not been challenged (Doc. 80-3). *See id*. at 1021.

Having satisfied Rule 23(a)'s requirements, the parties must next show the proposed class satisfies at least one subsection of Rule 23(b). Fed. R. Civ. P. 23(b). The parties here rely on Rule 23(b)(3), which allows for certification when common questions predominate over individual questions and when class resolution is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3). As discussed, the class shares common questions of law and fact, including whether LifeStance's use of the Pixel transmitted private and confidential health information and whether the proposed class had a reasonable expectation of privacy while interacting with the relevant websites. (Doc. 79 at 32-33.) These predominate over individual questions because all claims rely on these common issues regardless of individual differences like how many times each person visited the website. And, given the number of plaintiffs in the proposed class, class treatment is superior to other available methods of adjudication, which would expend far more judicial resources and represent far fewer injured parties.

For the foregoing reasons, the court finds the proposed class meets the minimum requirements for certification.

### B. Fairness, Adequacy, and Reasonableness

#### a. Legal Standard

After determining class treatment is permissible, the court evaluates the proposed settlement's fundamental fairness, reasonableness, and adequacy. Fed. R. Civ. P. 23(e)(2); *see Staton*, 327 F.3d 938 at 952. A settlement need only be "fair, adequate, and free from collusion," not perfect or one that delivers the maximum possible benefit to class members. *Lane v. Facebook, Inc*., 696 F.3d 811, 819 (9th Cir. 2012) (citing *Hanlon*, 150 F.3d 1011 at 1027). At the preliminary approval stage, a court need only consider whether the

proposed settlement (1) appears to be the product of serious, informed, non-collusive negotiations; (2) is obviously deficient; (3) improperly grants preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval. *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 363 (D. Ariz. 2009). A more complete assessment happens later at a fairness hearing after class members have been noticed and have made claims. *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 670 (E.D. Cal. 2008).

Courts make this preliminary assessment by looking primarily at "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; [and] the extent of discovery completed and the stage of the proceedings." *Lane*, 696 F.3d at 819; *see also Hanlon*, 150 F.3d at 1026. Additionally, following the 2018 amendments to Rule 23, courts must "balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class.'" *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (citing Fed. R. Civ. P. 23(e)). Courts evaluate the proportionality of attorneys' fees and also "scrutinize[e] the fee arrangement for potential collusion or unfairness to the class" using the *Bluetooth* factors. *Id*. at 1026. Signs of collusion include when:

> (1) counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
> (2) the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds . . . ; and
> (3) the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*In re Bluetooth*, 654 F.3d 935, 946-47 (9th Cir. 2011). The presence of these factors alone does not prove collusion, but demands much greater scrutiny and a clear explanation why the agreement does not betray class interests. *Id*. at 949; *see Briseño*, 998 F.3d at 1027. Pre-certification settlements are scrutinized particularly closely under this analysis because class counsel are not court-approved and have not yet devoted substantial resources to the case; they may therefore be more willing to strike a quick deal at the expense of the class.

*Briseño*, 998 F.3d at 1024-25 (potential for collusion "reaches its apex pre-class certification"); *see also Bluetooth*, 654 F.3d at 947.

### b. Approval of Settlement in Present Case

Applying these principles, there are multiple areas of concern with the settlement proposed here. One is the parties' failure to address the proposed settlement's value compared to the potential liability at stake. Courts often deny approval where plaintiffs provide "no information about the maximum amount that the putative class members could have recovered if they ultimately prevailed on the merits of their claims." *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 969 (N.D. Cal. 2019) (internal citations omitted)); *see also Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1084 (C.D. Cal. 2023). Not knowing how plaintiffs valued the case pre-settlement hinders a meaningful determination of the reasonableness of members' recoveries or the strength of the case. *See Hanlon*, 150 F.3d at 1026.

But the court's primary point of concern is the attorneys' fees structure given that the court cannot fully value the settlement at this stage. *Briseño*, 998 F.3d at 1024.

The court can currently value the settlement using only its monetary terms. The settlement is comprised of monetary funds, coupons for one free year of privacy monitoring, and injunctive relief. The monetary funds can be valued: $1,203,405 (66%-75% earmarked for Subclass 1 and 25%-33% for attorneys for that subclass), $750,000 (earmarked for attorneys for Subclasses 2 and 3), and $300,000 (earmarked for the class administrator). However, the injunctive relief adds no monetary value to the settlement given that the tracking behavior is allegedly illegal—presumably giving rise to further litigation if it resumed—and more importantly, LifeStance had already ceased that behavior well before the parties settled (Doc. 79 at 15). *See Briseño*, 998 F.3d at 1028 (injunction valueless where bound party was already acting according to injunction and would be unlikely to revert to old ways); *see also Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1055-56 (9th Cir. 2019) (unless court can explain its monetary value, injunctive relief is excluded from settlement's valuation for attorneys' fees purposes).

1    Additionally, the vouchers for privacy monitoring appear to be coupons, which are

2    treated differently than gift cards or money in settlement calculations. The vouchers here

3    are exclusively for one product from one provider; they do not appear to be transferrable;

4    they appear to expire if not used the same year they are offered; and they do not convert to

5    cash. *See In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 950-951 (9th Cir.

6    2015) (listing factors that define coupon settlements). The parties did not include the

7    vouchers' exact monetary value in their own valuation of the settlement, suggesting they

8    too do not consider the vouchers to be a cash equivalent. A court may only consider the

9    value of *redeemed* coupons when determining a settlement's value for attorneys' fees

10   calculations. *See In re HP Inkjet Printer Litig.*, 716 F.3d at 1182; 28 U.S.C. § 1712.

11   Obviously, that information is not available at the preliminary approval stage. So, this court

12   can only determine the fairness of attorneys' fees vis-à-vis class relief by using the

13   settlement's monetary value.

14   This exercise quickly makes clear each of the *Bluetooth* factors is present.

15   First, the attorneys' award is disproportionately high compared to members' relief.

16   According to the parties' motion, plaintiffs' counsel will request 25% of the $1.2 million

17   fund (plus costs), the rest of which will go to members of Subclass 1 on a *pro rata* basis.[2]

18   (Doc. 79 at 18, 25.) According to the draft notice to the class, meanwhile, plaintiffs' counsel

19   will request attorneys' fees of "up to one-third of the Settlement Subclass 1 Fund, plus

20   costs and expenses." (Doc. 80-1 at 64.) Although the parties do not explain this

21   contradiction, either 25% or 33% would fall within the range courts commonly hold to be

22   reasonable and would not cause concern standing alone. *In re Novant Health, Inc*, No. 1:22-

23   cv-00697, 2024 WL 3028443, at *2 (M.D.N.C. June 17, 2024) (awarding attorneys' fees

24   of one-third of the settlement and citing other pixel-related cases awarding the same or

25   more); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (describing

26   _____

27   [2] A "*pro rata*" allocation merely describes a proportional allocation; the parties have not clarified whether the proportion each Subclass 1 claimant would receive would be an even split of the $1.2 million (less attorneys' fees and costs) or tied to, for instance, the number

28   of appointments the members made on LifeStance's website. The parties may wish to clarify their intended meaning if they renew their request for approval.

flexible "25% benchmark rate" for attorneys' fees from common funds).

But the amount for Subclass 1 does not stand alone. LifeStance has also agreed to pay $750,000 into a separate fund solely for attorneys' fees attributable to work done on behalf of Subclasses 2 and 3. (Docs. 79 at 18; 80-1 at 18-19.) And any money in that fund the court does not award to attorneys will revert to LifeStance. (Doc. 80-1 at 19.) This provision creates a concerning disparity between the settlement's awards for attorneys versus the class. Even if attorneys request only 25% of the $1.2 million and no litigation cost reimbursement, the attorneys could receive $1,050,851.25 total (25% of Subclass 1's fund plus the separate $750,000 fund) and class members will receive $902,553.75, or $5.25 each. *See In re Advoc. Aurora Health Pixel Litig.*, 740 F. Supp. 3d 736, 751 (E.D. Wis. 2024) ("The proper formula to calculate the fee request for purposes of the reasonableness analysis is as a percentage of the gross or total common settlement fund *less* administration and notice expenses and litigation costs.") It would clearly be disproportionate for attorneys to receive, at minimum, nearly *54%* of the total monetary relief.[3]

Second, by setting up a separate fund solely for attorneys' fees and agreeing LifeStance would not contest attorneys' $750,000 fee request, the parties appear to have negotiated a "clear sailing" arrangement. *See Bluetooth*, 654 F.3d at 947 (describing clear sailing agreement in which defendants agree not to contest an agreed-upon amount in attorneys' fees). "[T]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Id*. at 948.

Third, the agreement includes a kicker clause that reverts unpaid attorneys' fees from the $750,000 fund back to LifeStance rather than going to the class (Doc. 80-1 at 19).

---

[3] The $750,000 Subclasses 2 and 3 fees arrangement also seems to violate the principle that "[a]ttorney's fees are *never* attributable to an attorney's work on the action. They are attributable to the relief obtained for the class." *HP Inkjet*, 716 F.3d at 1182 ("An attorney who works incredibly hard, but obtains nothing for the class, is not entitled to fees calculated by any method."). Here, the attorneys recovered over $1 million for Subclass 1 and $0 for Subclasses 2 and 3 (that the court can currently calculate), yet they stand to receive nearly double in fees for Subclasses 2 and 3 compared to fees for Subclass 1—a result clearly disconnected from the relief obtained for these subclasses.

*Id*. at 949. This term "amplifies the danger of collusion already suggested by a clear sailing provision. If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is no apparent reason the class should not benefit from the excess allotted for fees." *Id*.; *see also Briseño*, 998 F.3d at 1025 (defendant should have "no reason to care about the allocation of its cost of settlement between class counsel and class members.") (simplified).

The presence of the *Bluetooth* warning signs alone—even, like here, all three—does not itself justify denying preliminary approval. *Briseño*, 998 F.3d at 1027. But it does require "a clear explanation of why the disproportionate fee is justified and does not betray the class's interests," particularly in a pre-certification settlement. *Bluetooth*, 654 F.3d. at 949. The present record does not justify the seemingly disproportionate award of fees compared to the relief afforded class members and does not explain why the clear sailing and kicker arrangements were created. And additional red flags join the *Bluetooth* factors here—namely, the omission of the case's prospective value and the disconnect between the attorneys' fees arrangement and the results won for Subclass 1 versus Subclasses 2 and 3.

The court recognizes that in applying heightened scrutiny, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Id*. at 948. "[T]he class recovery and the agreement on attorneys' fees should be viewed as a 'package deal,'" even when they are funded separately. *Id*. at 948-49. But the overall fairness of the attorneys' fees provisions seems to largely depend on how many class members redeem a voucher for privacy monitoring, and the court could not find the proposed settlement fair if none do. Absent a clear explanation as to the attorneys' fees terms, collusion is too great a risk to support preliminary approval.

## IV.    Conclusion

The request for preliminary approval is denied. If the parties wish to renew their motion with the same settlement terms, they must provide a clear explanation as to how the settlement came about; why it is not collusive; and why it is fair, particularly regarding the reversionary $750,000 fund and the relationship of the vouchers to the rest of the

settlement. Additionally, the parties should clarify whether they believe the proposed settlement gives the court the discretion to award attorneys' fees in a way that would reduce the disproportionality when considering the monetary value of the settlement as a whole (for example, by awarding less than 25% of the $1.2 million fund in attorneys' fees if $750,000 for Subclasses 2 and 3 is also awarded). In the absence of that explanation, the court finds collusion is likely and the recovery is disproportionately skewed toward class counsel.

Accordingly,

**IT IS ORDERED** the Motion for Preliminary Approval (Doc. 79) is **DENIED**.

**IT IS FURTHER ORDERED** if the parties wish to renew their motion for preliminary approval of the class action settlement, they must do so within **30 days** of the date of this order.

Dated this 6th day of October, 2025.


**Honorable Krissa M. Lanham**
**United States District Judge**